# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

————————————————————
)
**EDWARD RICHARDSON,**                )
)
    **Plaintiff,**                )
)
    **v.**                )    **Civil Action No. 14-1673 (RMC)**
)
**JEROME H. POWELL, Chair, Board**    )
**of Governors of the Federal Reserve** )
**System,**                )
)
    **Defendant.**                )
————————————————————
)

## MEMORANDUM OPINION

Edward Richardson, who suffers from asthma, sues the Federal Reserve Board of Governors, his former employer, alleging workplace discrimination and discharge because of his disability, in violation of the Rehabilitation Act. The government argues that Mr. Richardson was terminated due to problems with his background security check and performance issues. Both parties move for summary judgment.[1] Having reviewed the parties' briefs and the record, the Court will grant the government's motion for summary judgment and deny Mr. Richardson's cross-motion for summary judgment.

---

[1] *See* Def.'s Mot. for Summ. J. (Def.'s Mot.) [Dkt. 137]; Def.'s Statement of Undisputed Material Facts (Def.'s SOF) [Dkt. 137-24]; Pl.'s Cross-Mot. for Summ. J. (Pl.'s Cross-Mot.) [Dkt. 139]; Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. [Dkt. 142]; Pl.'s Opp'n to Def.'s Mot. for Summ. J. (Pl.'s Opp'n) [Dkt. 143]; Def.'s Reply in Supp. of Mot. for Summ. J. (Def.'s Reply) [Dkt. 145]; Pl.'s Reply to Def.'s Opp'n and in Supp. of Cross-Mot. for Summ. J. (Pl.'s Reply) [Dkt. 146].

# I. BACKGROUND

## A. The Board's Explanation of Mr. Richardson's Termination

The government tells one story of Mr. Richardson's employment:

From June 8, 2009, until June 7, 2010, Edward Richardson was employed by the Board of Governors of the Federal Reserve System (the Board) as a provisional Law Enforcement Officer (LEO) in the Law Enforcement Unit (LEU). Def.'s SOF ¶ 1. Board officers are responsible for the physical security of Board premises and stand a variety of posts at the Board's facility in Washington, D.C. *Id.* ¶ 2. Pursuant to the job description, a Board LEO "[w]orks under demanding mental and physical conditions," "[m]ust successfully pass a background investigation," "[m]ust be prompt," and "[w]orks rotating shifts, weekends and holidays as dictated by the unit's need to provide sufficient security coverage on a 24 hour basis, 7 days a week." *Id.* ¶ 3.

Mr. Richardson's offer letter stated that his appointment was "subject to the Board's one-year provisional employment period" and "contingent upon" his "[s]uccessful completion of a background investigation, which includes a national agency check with written inquiries (SF-86)." *Id.* ¶ 4. The offer letter also informed Mr. Richardson that his "background investigation will be initiated after you begin employment with the Board. If for any reason the Board identifies a problem pursuant to that investigation the Board has the right to terminate your employment at that time." *Id.* ¶ 5.

Mr. Richardson signed his SF-86 background investigation questionnaire on August 28, 2009, certifying that in the last seven years he had not been "1. Fired from a job"; "2. Quit a job after being told you would be fired"; "3. Left a job by mutual agreement following charges or allegations of misconduct"; "4. Left a job by mutual agreement following notice of unsatisfactory performance"; or "5. Left a job for other reasons under unfavorable

circumstances." *Id.* ¶ 6. Despite this certification, Mr. Richardson's Office of Personnel Management (OPM) background investigation reported that he had been charged with misconduct by his previous employer, the Prince William County Police Department, and that that Department issued a termination letter to Mr. Richardson in April 2009, after a hearing on the charges at which Mr. Richardson was found to be "misleading and untruthful." *Id.*

Mr. Richardson also had problems while working for the Board. On March 4, 2010, Mr. Richardson allowed a vehicle with six passengers to enter the Board's parking garage without checking the passengers' identifications as he was required to. *Id.* ¶ 9. In addition, he had "repeated unapproved incidents of tardiness" during his year with the Board. *Id.* ¶ 10; *see also* Def.'s Mot., Ex. C, Appeals Termination Letter [Dkt. 137-2] at 3.

Based on the results of his background investigation and these performance issues, the Board terminated Mr. Richardson at the end of his provisional employment period. Def.'s SOF ¶ 11. The Board affirmed this decision on internal appeal, citing Mr. Richardson's lack of candor in the background investigation process as an additional basis for his termination. *Id.* ¶ 12; Appeals Termination Letter.

### B. Mr. Richardson's Explanation for His Termination[2]

Mr. Richardson tells another story about his time at the Board:

Mr. Richardson is a military veteran, who came home from war with lung problems that led to asthma. In November 2009, shortly after completing basic training with the

---

[2] Mr. Richardson proceeds *pro se*. He filed no Statement of Facts with his cross-motion for summary judgment and the section of his brief titled "Statement of Undisputed Material Facts" comprises argument and legal conclusions and is largely unsupported by citations to the record. *See* Pl.'s Cross-Mot. at 4-22. Because Mr. Richardson proceeds *pro se*, the Court will not deny his motion for procedural irregularity and addresses the merits.

Board, Mr. Richardson was put under the supervision of Sergeant Robert Bakale. Pl.'s Cross-Mot., Ex. A, Aff. of Robert Bakale (Bakale Aff.) [Dkt. 139-1] at 139.[3] Around that time Mr. Richardson verbally informed Sgt. Bakale that he suffered from asthma. *Id.* Mr. Richardson alleges that around this same time he asked Sgt. Bakale for a reasonable accommodation due to his asthma, "only to accommodate my disability related call-offs, and to attend disability related medical appointments."[4] Am. Compl. [Dkt. 8] ¶¶ 13-14. Although Sgt. Bakale allegedly promised to relay this request to LEU managers, Mr. Richardson's request went unacknowledged. *Id.* ¶¶ 12-13.

Notwithstanding his alleged request for an accommodation, over the next few months the Board logged multiple call-offs and incidents of late arrival (tardiness or "tardies") for Mr. Richardson.[5] Pl.'s Cross-Mot., Ex. B, Bakale Call-Off Email [Dkt. 139-2] at 64-66. Although some of these call-offs were excused, many were not and Mr. Richardson was progressively disciplined as a result. *Id.* (listing 10 unexcused call-offs, 4 excused call-offs, and 5 tardies). Mr. Richardson alleges that he had medical documentation excusing all of his call-offs but that his supervisors removed the medical documentation from his file "to promote an

---

[3] Mr. Richardson's exhibits generally consist of multiple individual documents compiled into a single exhibit. As such, citations to his exhibits reference the document title, where applicable, and the ECF page number.

[4] A "call-off" is an unscheduled absence from duty which results in use of leave. Def.'s Reply, Ex. X, General Order: #168 Leave Policy (Rev. June 10, 2009) [Dkt. 145] at 451. Because they are unscheduled, call-offs are "unexcused" by default. However, a call-off can become "excused" if sufficient documentation, such as a doctor's note, is subsequently provided. *See* Pl.'s Cross-Mot., Ex. A, Aff. of Larence Dublin (Dublin Aff.) [Dkt. 139-1] at 68.

[5] Unlike a call-off, an officer is marked for "tardiness" when he is merely "[l]ate for roll call or duty without having approved leave." Pl.'s Cross-Mot., Ex. G, General Order: #161 Work Attendance Guidelines [Dkt. 139-7] at 54.

adverse action, as well as render the impression that [he] never produced supporting documentation for any of his disability related call-offs." Pl.'s Cross-Mot. at 7-8.

Mr. Richardson was also the subject of teasing at the workplace—another Board officer, Himanshu Bhatia, called him "sumo," allegedly on account of his "height to weight ratio." Am. Compl. ¶ 192; *see also* Pl.'s Cross-Mot., Ex. A, Aff. of Himanshi Bhatia (Bhatia Aff.) [Dkt. 139-1] at 263. Mr. Richardson alleges that this name calling was sanctioned by his supervisors in retaliation for his request for reasonable accommodations. Pl.'s Cross-Mot. at 11. Mr. Richardson alleges further indignities due to his disability: he was denied a promotion to Senior LEO, Am. Compl. ¶ 193; assigned to three different work shifts, *id.*; denied placement in a desirable "hybrid" shift, *id.* ¶ 197; and given unfavorable performance reviews, *id.* This discriminatory treatment allegedly culminated in his unlawful termination.

Although Mr. Richardson's complaint alleges a variety of federal and common law claims, all but his claim under the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq*., have earlier been dismissed.[6] After extensive discovery, both parties now move for summary judgment.

## II.  LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure states that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Anderson v.*

---

[6] *See* 3/8/16 Mem. Op. [Dkt. 25]; 3/8/16 Order [Dkt. 26]. This Memorandum Opinion does not address the dismissed claims which Mr. Richardson attempts to resuscitate in his briefs. This Memorandum Opinion also does not address Mr. Richardson's claim under the No FEAR Act, which was raised in his briefs, *see* Pl.'s Cross-Mot at 2 and n.2, but not in his complaint and which was also dismissed in other proceedings before this Court. *See Richardson v. Bd. of Governors of the Fed. Res. Sys.*, 248 F. Supp. 3d 91, 104 (D.D.C. 2017).

*Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is "material" if it is capable of affecting the substantive outcome of litigation. *Anderson*, 477 U.S. at 248. A dispute is "genuine" if there is sufficient admissible evidence such that a reasonable jury could return a verdict for a non-moving party. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, a court must draw all justifiable inferences in the nonmoving party's favor. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. The nonmoving party must point to specific facts showing that a genuine issue of material fact requires trial. *Celotex*, 477 U.S. at 324. The nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence "is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50. "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of his obligation to support his allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Hussain v. Principi*, 344 F. Supp. 2d 86, 94 (D.D.C. 2004) (quoting *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. March 31, 1998)).

The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability" may "be subjected to discrimination" by any federal agency "solely by reason of her

or his disability." 29 U.S.C. § 794(a).  The Act further provides that "[t]he standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under . . . the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 *et seq*.)."  *Id.* § 794(d).  Indeed, because the Rehabilitation Act and ADA are similar in substance, cases brought under one statute are often analyzed in a manner similar to the other.[7]  *See Chenari v. George Washington Univ.*, 847 F.3d 740, 746 (D.C. Cir. 2017).

### III.  ANALYSIS

#### A.  Termination Because of Disability

The core of Mr. Richardson's case is that the Board terminated his employment because of his asthma.  In response, the Board has articulated a series of legitimate, non-discriminatory reasons for his termination.  Mr. Richardson attributes several other wide-ranging, allegedly discriminatory reasons to the Board's decision.  Unlike some other discrimination statutes which allow for mixed-motive theories of discrimination, the Rehabilitation Act states that a violation of the law occurs only when an employee is discriminated against "*solely* by reason of" his disability.  29 U.S.C. § 794(a) (emphasis added); *cf* 42 U.S.C. § 2000e-2(m) (stating that, under Title VII, "race, color, religion, sex, or national origin" may not be "*a motivating factor* for any employment practice, even though other factors also motivated the practice" (emphasis added))*.*  Thus, "a plaintiff seeking vindication under the Rehabilitation Act must prove that his disability was the 'sole' or 'but-for' reason for the employer's actions or inactions, regardless of whether the plaintiff advances a claim of discrimination based on

---

[7] Accordingly, many of the citations in this Memorandum Opinion for requirements of the Rehabilitation Act will be to the ADA and its related regulations and case law.

disparate treatment, mixed-motive, or retaliation." *Gard v. Dep't of Educ.*, 752 F. Supp. 2d 30, 36 (D.D.C. 2010) (quoting 29 U.S.C. § 794(a)).  As applied in this context, even if Mr. Richardson can prove that he was terminated at least *in part* for discriminatory reasons, Mr. Richardson's claim will still fail if the Board can support its legitimate, non-discriminatory reason for terminating him, because Mr. Richardson will have failed to demonstrate that he was terminated "solely" because of his disability.

### 1.  Background Investigation

The Board contends that Mr. Richardson was terminated predominately because his background investigation revealed significant, unfavorable information that he had failed to disclose about his prior employment as an officer with the Prince William County Police Department.  *See* Def.'s Mot., Ex. A, Termination Letter [Dkt. 137-1].  When deciding whether to retain Mr. Richardson at the end of his probationary period and after the completion of his background check, the Board considered, among other things, "misconduct or negligence in prior employment or outside employment."  *Id.* at 1; *see also* Def.'s Mot., Ex. H, Bd. Suitability Policy [Dkt. 137-8] at 3.  The background investigation revealed that Mr. Richardson: (1) resigned in lieu of being fired from the Prince William County Police Department; (2) violated that Department's general orders 2.01-C(16), 2.01-C(31), and 27.04-E, and was misleading and untruthful, resulting in that Department's decision to terminate him; (3) was involved in two automobile accidents, which the Prince William County Police Department determined he could have prevented; and (4) received a letter of reprimand for failing to arrest a mall security guard, in violation of the Prince William County Police Department's general order 39.02.  *See* Termination Letter at 2-3; Def.'s Mot., Ex. J, OPM Background Investigation [137-10].  The Board described these as "very significant problems" which alone "could result in an employee being deemed unsuitable for Board employment."  Termination Letter at 2.

Mr. Richardson responds by alleging that the negative marks on his record are the result of pervasive racial discrimination, harassment, and retaliation at the Prince William County Police Department. But this argument is unavailing. Even if Mr. Richardson's unsubstantiated attacks on the Prince William County Police Department were true, he was the one who failed to report the relevant events (with or without explanation) on his SF-86 and elsewhere. Indeed, during his internal appeal of his termination from the Board, Mr. Richardson advanced his allegations about the Prince William County Police Department, the Board gave Mr. Richardson several opportunities to meet with the appeals officer to provide evidence of his charges, and Mr. Richardson ultimately declined to meet with her and provided no "independent or corroborating information" to support his "conclusory assertions." Def.'s Mot., Ex. B, Appeals Termination Letter [Dkt. 137-2]. Although Mr. Richardson has now filed additional information with this Court in an attempt to prove his claims regarding the Prince William County Police Department, that information was not before the Board when it made its decision, is therefore irrelevant to the Board's decision under review, and is not entirely exculpatory.[8] Given the available evidence before the Board, no reasonable juror could find that the background investigation report prepared by OPM was erroneous or that the Board's reliance on it was triggered by discriminatory intent because of Mr. Richardson's disability.

---

[8] Mr. Richardson notes that the Prince William County Police Department determined that the charge that he had failed to arrest was "unfounded." *See* Pl.'s Mot., Ex. H, Letter Re: Violation of General Orders [Dkt. 139-8] at 81. Nonetheless, he received a written reprimand related to this incident, *see id.*, and it was just one incident among several that he failed to report to the Board from that previous job.

## 2. *Misstatements in Employment Application and Background Investigation Materials*

A second reason the Board terminated Mr. Richardson was his failure to provide accurate facts related to his prior employment on forms and during interviews before he was hired by the Board. When deciding whether to retain Mr. Richardson at the end of his probationary period, the Board considered "the provision of false or misleading information on an employment application, in connection with an employment application, or in response to an inquiry or investigation to determine employment suitability." Termination Letter at 1; *see also* Bd. Suitability Policy at 3. The SF-86 which Mr. Richardson completed, signed, and submitted to begin his background check stated on the first page, immediately above his signature:

> My statements on this form, and on any attachments to it, are true, complete, and correct to the best of my knowledge and belief and are made in good faith. I have carefully read the foregoing instructions to complete this form. I understand that a knowing and willful false statement on this form can be punished by fine or imprisonment or both (18 U.S.C. 1001). I understand that intentionally withholding, misrepresenting, or falsifying information may have a negative effect on my security clearance, employment prospects, or job status, up to and including denial or revocation of my security clearance, or my removal and debarment from Federal service.

Def.'s Mot., Sealed Ex. 1, Form SF-86 Questionnaire for National Security Positions (Richardson SF-86) [Dkt. 138-1] at 1. Instructions included with his SF-86 expressly warned about "Penalties for Inaccurate or False Statements," stating that "Federal agencies generally fire, do not grant a security clearance, or disqualify individuals who have materially and deliberately falsified these forms." *Id.* at 4. The instructions further elaborated: "Your prospects of placement . . . are better if you answer all questions truthfully and completely. You will have adequate opportunity to explain any information you give to us on this form." *Id.*

According to his own testimony, Mr. Richardson submitted his letter of resignation to the Prince William County Police Department on January 22, 2009, one day after he was interviewed by internal affairs regarding a use of force incident, placed on administrative leave, and stripped of his police powers, badge, weapon, and police identification. Def.'s Mot., Ex. I, Dep. of Edward Richardson (Richardson Dep.) [Dkt. 137-9] at 174-76. Nonetheless, when queried on his SF-86 why he had left that job, Mr. Richardson stated merely "new employment."[9] Richardson SF-86 at 23. Further, when asked if, within the last seven years, he had been fired from a job, quit a job after being told he would be fired, left a job by mutual agreement after either allegations of misconduct or notice of unsatisfactory performance, or otherwise left a job under unfavorable circumstances, Mr. Richardson checked the box stating "no." *Id.* at 28. In similar fashion, as part of his psychological evaluation, Mr. Richardson reported that he had served on the Prince William County Police Department until January 2009, when he "left under entirely favorable terms, explaining that there were economic issues and he and other officers feared being laid off." Def.'s Mot., Sealed Ex. 2, Richardson Psych. Rep. [Dkt. 138-2]. Mr. Richardson was similarly inaccurate on his initial application form, telling the Board that he had left the Prince William County Police Department because he was "looking for more opportunity advancement." Def.'s Mot., Ex. D, App. for Employment [Dkt. 137-4] at 2.

Mr. Richardson denies that he made any misrepresentations on his application forms, in part because he believes the sanctions he received from the Prince William County Police Department were unjustified. *But see* Def.'s Mot., Sealed Ex. 3, D.C. Corrections App. [Dkt. 138-3] at 4 (describing more completely his departure from the Prince William County

_____

[9] Mr. Richardson provided this answer in August 2009, approximately 4 months after receiving his letter of termination from the Prince William County Police Department. *See* Pl.'s Cross-Mot., Ex. H, Prince William Cty. Police Dep't Termination Letter [Dkt. 139-8] at 79-80.

Police Department on another job application). But Mr. Richardson does not deny that he left his job as a police officer under unfavorable conditions, regardless of their underlying merit, and was obligated to disclose that to the Board, with explanation if he chose, so that the Board could reach its own conclusions as to their significance.

Mr. Richardson further argues that three of his coworkers at the Board also misrepresented themselves on their applications or had been disciplined at a previous job, implying that Mr. Richardson is the subject of selective enforcement due to discrimination because of his asthma. In discrimination cases, a plaintiff can establish employer animus by demonstrating that similarly situated employees without similar disability, race, age, etc., received more favorable disciplinary treatment. "To prove that he is similarly situated to another employee, a plaintiff 'must demonstrate that he and the allegedly similarly situated employee were charged with offenses of comparable seriousness.'" *Burly v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (quoting *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999) (marks omitted)). "A plaintiff must also demonstrate that 'all of the relevant aspects of his employment situation were nearly identical to those of the other' employee." *Id.* (quoting *Holbrook*, 196 F.3d at 261) (marks omitted).

Mr. Richardson first asserts that Officer ██████ H███ also did not disclose that he "resigned [from his previous job] at the beginning of his separation" process from that employer. Pl.'s Cross-Mot., Ex. E, ██████ H███ OPM Investigation [Dkt. 139-5] at 157. However, the document he cites makes clear that the referenced "separation" concerned Officer H███' marital separation, not parallel employment separation proceedings at a previous employer. *Id.*

Secondly, Mr. Richardson argues that Officer ███ L███ failed to disclose written reprimands for misconduct she had received at a prior job. However, the misconduct to which Mr. Richardson refers was (i) talking back to a training officer and (ii) two instances of tardiness, both of which appear to have been self-disclosed by Officer L██ during her background investigation, which she explained by describing extenuating circumstances. Pl.'s Cross-Mot., Ex. 5, ███ L███ OPM Investigation [Dkt. 139-5] at 117-19.

Thirdly, Mr. Richardson contends that Officer ███ C███ was also terminated from a previous job for misconduct. However, Officer C███ informed the Board about his prior termination on his SF-86; the case surrounding Officer C███'s previous alleged misconduct was settled largely in Officer C███'s favor; and Officer C███ voluntarily disclosed additional details to the OPM investigator. Pl.'s Cross-Mot., Ex. 5, ███ C███ OPM Investigation [Dkt. 139-5] at 20-21, 33-35.[10]

The Court finds that none of these other Officers was comparable to Mr. Richardson. Mr. Richardson has mis-read Officer H██' OPM investigation and both Officers L██ and C███ reported the incidents in their past and explained them to OPM and to the Board's satisfaction. Mr. Richardson did neither. Without an appropriate comparator, there is no evidence that the Board selectively disciplined Mr. Richardson, much less that it did so because of his disability.

### 3. Job Performance

The Board also rests its termination decision, in part, on Mr. Richardson's on-the-job performance during his probationary period. It is uncontested that on March 4, 2010, Mr.

---

[10] While Mr. Richardson's Cross-Motion adds more instances of alleged misconduct by his former colleagues, Pl.'s Cross-Mot. at 28-29, none is sufficiently substantiated to warrant discussion.

Richardson did not check the identifications of all passengers in a vehicle entering the Board's garage. *See* Def.'s Mot., Ex. K, Breach of Security Mem. [Dkt. 137-11]. Mr. Richardson essentially admitted to this breach of the security protocol in a follow-up memo to his supervisor, even as he attempted to explain. *See* Def.'s Mot., Ex. L, East Court Booth Incident Memo [Dkt. 137-12] ("This is why I did not exit the booth to check the vehicle and I am very well aware of the proper procedure of checking identification of individuals."); *id.* ("I have recognized my mistake and will accept disciplinary action!"). Although Mr. Richardson now argues there was no actual breach of security because he "physically identified each individual passenger" in the car, Pl.'s Cross-Mot. at 11, his conclusory statements cannot overcome his contemporaneous admissions which support the Board's evaluation of this incident.

Another aspect of Mr. Richardson's poor job performance identified by the Board is that he was repeatedly late to work. Mr. Richardson admits to having "been tardy on two occasions due to traffic issues on 95." Richardson Dep. at 200; *see also* Appeals Termination Letter at 4 ("You have not presented any evidence that your illness played a role in any of these incidents. In fact, the only reason that you provided for your tardiness was that you were delayed because of accidents on I-95."). Mr. Richardson responds in his current brief that the various documents that list his unexcused call-offs are fabrications. *See* Pl.'s Cross-Mot. at 13-14. Having compared Mr. Richardson's references to the record, the Court finds no support for this claim of fabrication. More importantly, the argument misses the point: it neither addresses nor justifies with medical documentation the disability-related reasons for his "repeated episodes

of unapproved tardiness," Appeals Termination Letter at 4, which are different from his call-offs and constitute a separate matter of proof for which he bears the burden.[11]

In summary, the Board has provided legitimate, non-discriminatory reasons for its decision to terminate Mr. Richardson. Mr. Richardson complains about his treatment while working for the Prince William County Police Department but does not, and cannot, avoid the fact that he did not report or explain any of those issues on his SF-86 and, instead, provided answers that were less than accurate. Both his hidden prior resignation-in-lieu-of-termination, which perhaps might have been explained and excused, *and* his lack of candor violated the express terms and purposes of his background security form. Further, his work performance was admittedly not stellar. Mr. Richardson does not rebut the Board's evidence with evidence of his own that might suggest the reasons for his termination were pretextual and that he was discharged "solely" because of his disability.

### B. Missing Medical Documentation

The Rehabilitation Act generally prohibits questions about an employee's medical condition, although "inquiries into the ability of an employee to perform job-related functions" are allowed. 42 U.S.C. § 12112(d)(4). An employee's medical information is to be kept confidential, except as necessary for supervisors and managers to provide accommodations or for government investigations. *Id.* § 12112(d)(3). Thus, the Act ensures "that the information disclosed pursuant to an employer's medical inquiry spreads no farther than necessary to satisfy the legitimate needs of both employer and employee." *Doe v. Postal Serv.*, 317 F.3d 339, 344 (D.C. Cir. 2003). "[I]n order to state a claim under the Rehabilitation Act's confidentiality

---

[11] Although Mr. Richardson argues that his January 6, 2010 tardiness was "excused" because his car was blocked by a horse trailer and he called Sgt. Bakale beforehand, this is unrelated to his medical condition or Rehabilitation Act claim.

provisions, a plaintiff must show that an unauthorized disclosure of medical information resulted in 'tangible injury.'" *Koch v. Walter*, 935 F. Supp. 2d 164, 176 (D.D.C. 2013) (internal citations omitted) (quoting *Cossette v. Minnesota Power & Light*, 188 F.3d 964, 970 (8th Cir. 1999)).

The record indicates that as of May 20, 2010, the Board believed Mr. Richardson had 4 excused call-offs, 10 unexcused call-offs, and 5 tardies. Bakale Call-Off Email at 64-66. Mr. Richardson states that the "record clearly reflects" that all of his call-offs "were directly related to his disability" and that each "was supported by medical documentation." Pl.'s Cross-Mot. at 7. Mr. Richardson alleges that medical documentation excusing his call-offs, to wit doctors' slips related to his disability, was intentionally removed from his file because of his disability.[12] He further argues that the removal of these slips gave the appearance that he had more unexcused call-offs than he actually did, resulting in his termination.

The Court looks to the record for evidence of this claim. Mr. Richardson appears to have submitted documentation for 2 of the 10 unexcused call-offs: October 13, 2009, and April 28, 2010. *See* Pl.'s Cross-Mot, Ex. B, NextCare Urgent Care Note (Oct. 13, 2009) [Dkt. 139-2] at 10-11; Pl.'s Cross-Mot, Ex. B, NextCare Urgent Care Note (Apr. 28, 2010) [Dkt. 139-2] at 115-16.[13] Eight unexcused call-offs remain without medical documents. Mr. Richardson

---

[12] Although this is the current iteration of Mr. Richardson's claim, he has previously argued that his "medical documentation was removed from his file by Lt. Coble as a result of Officer Richardson writing a formal complaint against Senior Officer Adam's [sic]" "for actions unbecoming of an Officer," and *not* because of Mr. Richardson's disability. Def.'s Mot., Ex. N, EEO Compl. of Discrimination [Dkt. 137-14] at 5, 9. His change in thesis may be acceptable—alternative theories are often advanced—but the difference between the two undercuts his most recent argument in his brief.

[13] Bates numbering and exhibit markings on the documents seem to indicate that these documents were provided to Mr. Richardson, *i.e.*, were in the government's possession and not destroyed.

asserts that he also had medical documentation for those call-offs. However, Mr. Richardson has provided no personal copies to corroborate this claim and his medical provider states that he had appointments covering only the October 13, 2009 and April 28, 2010 call-offs referenced above.[14] Pl.'s Cross-Mot, Ex. B, NextCare Appointments Letter (May 22, 2010) [Dkt. 139-2] at 114. Mr. Richardson cites the Board's 2005 Leave Policy for the proposition that he was not required to document those call-offs because they were each only for one day. *See* Pl.'s Cross-Mot., Ex. G, General Order: #168 Leave Policy (Rev. June 1, 2005) [Dkt. 139-7] at 60-61 ("All requests for unanticipated sick leave . . . that will extend beyond three working days will require a doctor's certification upon return to duty."). Even if Mr. Richardson were correct, this would not support his claim that medical excuses for the 8 undocumented call-offs were removed from his personnel file because of his disability. More importantly, Mr. Richardson is not correct: the 2009 Leave Policy, effective 2 days after Mr. Richardson joined the Board, required documentation of all call-offs regardless of duration. *See* General Order: #168 Leave Policy (Rev. June 10, 2009) at 451. The Court recognizes that there is some testimony indicating that Mr. Richardson submitted more doctor's slips than found in his file. *See* Pl.'s Cross-Mot., Ex. A, Dep. of Franklin Williams (Williams Dep.) [Dkt. 139-1] at 94-95 (testifying Mr. Richardson submitted "at least four or five slips").

Although documentation exists for 2 of Mr. Richardson's unexcused call-offs, this combined with his assertions are insufficient to draw the inference that some, but not all, sick slips were systematically removed from his personnel file, particularly when Mr. Richardson has

---

[14] Mr. Richardson also included a list of his 2010 appointments at Walter Reed Army Medical Center. *See* Pl.'s Cross-Mot., Ex. B, Walter Reed History of Appointments: 2010 [Dkt. 139-2] at 118. None of the dates listed overlaps with his unexcused call-offs or tardies.

submitted no evidence showing that he in fact saw a doctor for any of his 8 other unexcused call-offs.[15]  At summary judgment, his argument alone is insufficient.  *Greene*, 164 F.3d at 675.

Most importantly, the arguments about sick slips for call-offs are irrelevant to Mr. Richardson's employment with the Board.  Among the Board's reasons for Mr. Richardson's termination was his "repeated episodes of unapproved tardiness," Appeals Termination Letter at 4, and not his call-offs, and Mr. Richardson attributes his tardies to traffic, not his disability.

### C.  Reasonable Accommodation

"The Rehabilitation Act require federal employers to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'"  *Steward v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1307 (D.C. Cir. 2010) (quoting 42 U.S.C. § 12112(b)(5)(A)).  "To prevail on a claim for denial of reasonable accommodation, [a plaintiff must] produce sufficient evidence (a) that she was disabled for purposes of the Rehabilitation Act; (b) that [the employer] had notice of her disability; and (c) that [the employer] denied her request for a reasonable accommodation of her disability."  *Id.* at 1307-08.  The Board does not challenge Mr. Richardson's disability or its notice of it but asserts that it never denied any request for a reasonable accommodation.

Mr. Richardson alleges that he was denied reasonable accommodations for his asthma, whereby he had asked for "use of leave without penalty to cover the Plaintiff's severe and persistent asthmatic condition."  Pl.'s Opp'n at 2.  Specifically, he alleges that he verbally informed his supervisor, Sgt. Bakale, of his need for a reasonable accommodation related to "disability related call-offs, and to attend disability related medical appointments," Am. Compl.

---

[15] Mr. Richardson had 8 unexcused call-offs across 10 days.  This is because back-to-back absences are counted as a single call-off.

¶ 14, but that he received no response to his requests. Mr. Richardson takes this silence as a

denial. Pl.'s Cross-Mot. at 30.

According to the government, no request from Mr. Richardson for such

accommodations, and thus no response from the Board, was necessary because the Board's leave

policies already allowed Mr. Richardson to use sick leave when necessary to address his asthma.

*See generally* General Order: #168 Leave Policy (Rev. June 10, 2009). In support of its position,

the government cites guidance from the Equal Employment Opportunity Commission (EEOC):

> [R]equests for leave related to disability can often fall under existing
> employer policies. In those cases, the employer's obligation is to
> provide persons with disabilities access to those policies on equal
> terms as similarly situated individuals. That is not the end of an
> employer's obligation under the ADA though. An employer must
> consider providing unpaid leave to an employee with a disability as
> a reasonable accommodation if the employee requests it, and so long
> as it does not create an undue hardship for the employer.

*Employer-Provided Leave and the Americans with Disabilities Act* (May 9, 2016), *available at*

https://www.eeoc.gov/eeoc/publications/ada-leave.cfm; *see also* EEOC Enforcement Guidance:

Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act

¶ 16 (Oct. 17, 2002), *available at* https://www.eeoc.gov/policy/docs/accommodation.html

("Permitting the use of accrued paid leave, or unpaid leave, is a form of reasonable

accommodation when necessitated by an employee's disability.").

Sgt. Bakale testified that Mr. Richardson was excused from call-offs for which he

provided medical documentation, *see* Bakale Aff. at 141, and consistent with that testimony Mr.

Richardson was excused from 4 call-offs across 8 days.[16] *See* Bakale Call-Off Email at 65. The

Court notes that Mr. Richardson was marked for unexcused call-offs on October 13, 2009, and

---

[16] A single excused call-off covered all of Mr. Richardson's absences December 7-11, 2009.

April 28, 2010, when he did have documentation to support his absence. But two recordkeeping errors do not show that Mr. Richardson was denied the accommodation that he requested.[17]

Mr. Richardson further argues that the Board failed to engage in an "interactive process" to accommodate his disability. Am. Compl. ¶ 21. However, "[t]here is no independent cause of action for failure to engage in the interactive process—under the ADA, and in turn the Rehabilitation Act, there is only a cause of action for failure to accommodate generally." *Doak v. Johnson*, 19 F. Supp. 3d 259, 278 n.20 (D.D.C. 2014). "Rather, plaintiffs in such cases typically point to accommodations that they failed to receive as a result of the breakdown in the interactive process." *Matos v. DeVos*, 317 F. Supp. 3d 489, 497 (D.D.C. 2018). Here, Mr. Richardson received the accommodation that he requested: time off for instances of asthma-related disability. Accordingly, no claim is left to bring to trial.

### D. Failure to Promote

Mr. Richardson argues that the Board discriminated against him because of his disability when it declined to select him for a Senior Law Enforcement Officer position in 2009. The vacancy announcement for the position clearly stated: "To be eligible to *apply* for a posted vacant position, employees must . . . have *served* at least six months in their current position." Def.'s Mot., Ex. S, Vacant-Position Posting [Dkt. 137-19] at 1 (emphasis added). The vacancy announcement was posted on November 6, 2009. Def.'s Mot., Ex. T, Aff. of Annita Cox [Dkt. 137-20] at 2. Mr. Richardson began working his position on June 8, 2009, less than six months earlier. *Id.* Although Mr. Richardson asserts that he could apply for a new position as soon as six months had passed since he was *offered* his job with the Board, his assertion is directly

---

[17] The Board explicitly excluded disability-related absences from its termination decision. *See* Appeals Termination Letter at 4 ("However, as explained above, you were not separated because you used sick leave to cover your illness-related absences.").

20

contradicted by the straightforward language of the posting and Mr. Richardson has provided no evidence to support his contrary reading. It is also noteworthy that the Board's recruiter for the vacancy knew of no exception to the eligibility criterion that might have applied to Mr. Richardson. *Id.*

### E. Hostile Work Environment

Mr. Richardson alleges that he was subjected to harassment and a hostile work environment because of his asthma. To establish a hostile work environment, a plaintiff must allege facts sufficient to demonstrate that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal cites and marks omitted). The hostile work environment standard is "sufficiently demanding" to ensure that it is not a "general civility code." *Id.* Even within the context of a retaliation claim, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work." *Burlington N. and Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Mr. Richardson's hostile work environment claim hinges on name-calling by another Board officer, Himanshu Bhatia, who called him "sumo," allegedly on account of Mr. Richardson's "height to weight ratio." Am. Compl. ¶ 192. Although Mr. Richardson states that he gained weight as a result of medication taken to address his asthma, Mr. Richardson does not explain how Mr. Bhatia would have been aware of this connection. Indeed, Mr. Richardson does not show that Mr. Bhatia was even aware of his asthmatic condition; the intention behind the

name calling appears unrelated to Mr. Richardson's underlying disability.[18]  And Mr. Richardson

provides no evidence that this name calling was sanctioned by management.  In any event, no

reasonable juror could find what is described by Mr. Richardson rises beyond "simple teasing" to

the severe and pervasive level necessary to succeed on a claim for hostile work environment.

### F.  Retaliation

"To establish a claim for retaliation, a claimant must show that (1) she engaged in

a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and

(3) a causal connection existed between the two."  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C.

Cir. 2007).  The standards for an "adverse action" to prove discrimination and a "materially

adverse action" to prove retaliation "are not conterminous."  *Burlington N.*, 548 U.S. at 67.

While the former requires "a significant change in employment status, such as hiring, firing,

failing to promote, reassignment with significantly different responsibilities, or . . . a significant

change in benefits," *Burlington Indus., Inc. v. Ellerth*, 523 U.S. 742, 760-61 (1988), a retaliation

complaint requires only action which "might have dissuaded a reasonable worker from making

or supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 67-68 (marks omitted).

That said, "[c]ontext matters. . . .  A schedule change in an employee's work schedule may make

little difference to many workers, but may matter enormously to a young mother with school-age

children."  *Id.* at 69.  "Neither a routine shift change nor a routine reassignment that was part of a

probationary employee's ordinary training can be deemed an adverse employment action, . . .

[but] it is conceivable that an employee might allege specific facts demonstrating that a

---

[18] Mr. Bhatia states in his affidavit:  "I used the term [sumo] jokingly and then at some point he asked me to stop.  Believing he may have been offended in some way, I immediately apologized to him and no longer used the term in our conversations."  Bhatia Aff. at 3.

seemingly routine reassignment was in fact retaliatory . . . ." *Jones v. Dist. of Columbia Dep't of Corr.,* 429 F.3d 276, 281 (D.C. Cir. 2005).

### 1. Three Shifts

Mr. Richardson first complains that the Board scheduled him to work on three different shifts in retaliation for his request for reasonable accommodations. Mr. Richardson states that he started working the day shift, volunteered for the 11:00 A.M. to 7:00 P.M. "power shift" "to assist with manpower issues or to cover for other officers," and then "was forced to work three shifts." Pl.'s Reply at 8; *see also* Richardson Dep. at 193. Mr. Richardson also states that the Board has identified no other officer who had such a "labor exhausting work schedule" and notes discrepancies between his supervisors' testimonies regarding his shift assignments. Pl.'s Cross-Mot. at 21-22.

In response, the government argues that it was common for officers to work across different shifts and that it "would not have been unusual for an officer . . . to spend time working on three different shifts during any given pay period." Def.'s Reply, Ex. X, Decl. of Michael Bagely [Dkt. 145-1] ¶ 2. And while both parties seem to agree that Mr. Richardson began on the day shift and was subsequently assigned to the power shift and the evening shift, Mr. Richardson does not allege, and nothing in the record documents, the timeframe for these assignments or that this occasion was particularly onerous. That is, if Mr. Richardson provided evidence that he was assigned to work three different shifts within an especially short period of time without volunteering—much less that the assignment was made because he had sought an accommodation—he might have a claim for retaliation. But no such evidence is found in the record; the most that can be said is that Mr. Richardson held three different shifts over the course of several months. *See* Pl.'s Cross-Mot., Ex. B, January Monthly Personnel Notes [Dkt. 139-2] at 72 ("Ofc. Richardson has agreed to work the 1100-1900 hour shift to assist with overtime

management."); Pl.'s Cross-Mot., Ex. B, February Monthly Personnel Notes [Dkt. 139-2] at 73 ("Officer Richardson continues working 1100-1900 hrs."); Pl.'s Cross-Mot., Ex. B, LEU Operations Bureau Shift Report [Dkt. 139-2] at 96 (showing that Mr. Richardson was assigned to the evening shift in June).

Further, there is no real inconsistency between the statements of Lieutenant Larence Dublin and Sgt. Bakale. Lt. Dublin stated: "Mr. Richardson did have several shift changes. I do not know whether they were based on his personal request or the manpower needs of the LEU." Dublin Aff. at 63-64. Sgt. Bakale stated: "Upon receiving several tardies, Mr. Richardson was placed on the Power Shift/Evening Shift."[19] Bakale Aff. at 140. Sgt. Bakale's personnel notes reflect both that Mr. Richardson "agreed to work the [power] shift to assist with overtime management," January Monthly Personnel Notes at 72, and that "Ofc. Richardson has shown improvement since being temporarily assigned to the [power] shift," *id.*, perhaps because it started later in the day.

Mr. Richardson does not allege that the different shifts to which he was assigned came with different pay or benefits or otherwise affected the terms of his employment; he does not allege that the three shifts were shifts to which he could not properly have been assigned, or that he objected to these shift changes; and he does not allege injury stemming from these shift assignments. To the contrary, the evidence in the record tends to show that the Mr. Richardson was moved from the day shift in response to his tardiness. Without evidence that Mr. Richardson was shuffled between different shifts in some injurious fashion and for a nefarious purpose, this claim will not survive summary judgment. *See Woodruff v. Peters*, 482 F.3d 521,

---

[19] Sgt. Bakale states that "[T]he power shift officers were detailed from the Evening Shift." Bakale Aff. at 140.

530 (D.C. Cir. 2007) ("[W]e conclude positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.").

### 2. Hybrid Shift

Mr. Richardson next challenges the Board's failure to allow him to bid on the hybrid shift, which failure he asserts was due to his disability. The hybrid shift involved 12-hour instead of 8-hour workdays and is distinguishable from the power shift. The hybrid shift was announced in early 2010 but did not begin until July 18, 2010, after Mr. Richardson had been terminated. *See* Richardson Dep at 11 ("Q. But the hybrid schedule never actually started before you were terminated from the Board, is that right? A. That's correct."); *see also* Pl.'s Reply, Ex. U, Email from Michael Bagley re: Hybrid Schedule (June 30, 2010) [Dkt. 146-3]. The Amended Complaint alleges that the "Defendants failed to select me for the [hybrid] shift because they had targeted me for termination." Am. Compl. ¶ 35. Even if this were true and provable, the Court has already determined that the Board had a legitimate, non-discriminatory reason to terminate Mr. Richardson. It follows that not selecting him for the hybrid shift because he was about to be terminated for cause was also for legitimate and non-discriminatory reasons.[20]

---

[20] Mr. Richardson also alleges that he was removed from eligibility for the Cash Award Program for Security (CAPS) in retaliation for his actions. This claim has not yet been administratively exhausted and so cannot be raised in this Court. *See* Def.'s Mot., Ex. R, Letter Describing Richardson EEO Claims [Dkt. 137-18]; *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010). The Court notes, however, that Mr. Richardson already had 5 unexcused call-offs by March 2010, even excluding the unexcused call-off for which he had documentation, enough to remove him from eligibility for a CAPS Award. *See* Bakale Call-Off Email at 65; General Order: #168 Leave Policy (Rev. June 10, 2009) at 452.

## IV.    CONCLUSION

For the forgoing reasons, the Board's Motion for Summary Judgement, Dkt. 137, will be granted.  Accordingly, Mr. Richardson's Cross-Motion for Summary Judgment, Dkt. 139, will be denied.  A memorializing Order accompanies this Memorandum Opinion.


Date: March 21, 2019                                     _____

ROSEMARY M. COLLYER
United States District Judge